OPINION
{¶ 1} Sherrie Lannom appeals from an order of the Juvenile Court entered pursuant to R.C. 2151.353(A)(3), terminating her parental rights with respect to her son, Bryan Jordan, Jr., age eleven. The order was entered on the motion of the Clark County Department of Job and Family Services ("CCDFJS") filed pursuant to R.C. 2151.413(A).
 {¶ 2} Lannom presents two assignments of error on appeal. Both contend that the record fails to contain clear and convincing evidence of matters that the court found and on which its order is based.
 {¶ 3} R.C. 2151.353(A)(5) requires the court to make certain findings on the basis of clear and convincing evidence. Clear and convincing evidence is that evidence which "produce(s) in the mind of the trier of facts a firm belief or conviction as to the facts to be established." Cross v. Ledford (1954), 161 Ohio St. 469, 469.
 {¶ 4} Notwithstanding the higher standard that a "clear and convincing evidence" requirement imposes, an appellate court's standard of review on a challenge that clear and convincing evidence is lacking remains the abuse of discretion standard. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the (trial) court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 FIRST ASSIGNMENT OF ERROR {¶ 5} "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT FOUND THAT THERE WAS CLEAR AND CONVINCING EVIDENCE THAT THE MINOR CHILD COULD NOT BE PLACED WITH THE APPELLANT WITHIN A REASONABLE TIME OR AT ALL."
 {¶ 6} The first of the two predicate findings the trial court was required to make is that the child "cannot be placed with either of his parents within a reasonable time or should not be placed with his parents." R.C. 2151.353(A)(4). R.C. 2151.414(E) states that in making a determination as to whether a child can or cannot be placed with a parent within a reasonable period of time, the court must consider all relevant evidence. R.C. 2151.414(E) goes on to list sixteen alternative factors that, if found by clear and convincing evidence, require the court to enter a finding that the child cannot or should not be placed with his or her parents. Three of the sixteen factors appear applicable in this case. They are R.C. 2151.414(E)(1), (2), and (4). They state:
 {¶ 7} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 8} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 {¶ 9} "* * *
 {¶ 10} "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 {¶ 11} "* * *."
 {¶ 12} The trial court made the following finding with respect to placement with the parents:
 {¶ 13} "The child cannot be placed with either parent within a reasonable period of time. The mother has offered no evidence to indicate that she is ready, willing or able to provide for the child. It would be inappropriate and unsafe to place a child in that home. The father did not appear at the hearing and his whereabouts are unknown at this time. It is impossible to contemplate placement of the child with a father whose whereabouts are unknown.
 {¶ 14} "The mother continues to reside with relatives. She is unable to obtain or maintain a proper place to live on her own. She suffers from significant, chronic mental disabilities that will be life lasting. There is no likelihood that the mother will ever be able to provide for the needs of the child. It is inappropriate to place the child with a mentally retarded parent who cannot care for herself."
 {¶ 15} Lannom argues that none of the R.C. 2151.414(E) factors that the trial court relies on are supported in the record by clear and convincing evidence. Therefore, she argues, the trial court abused its discretion in finding that Bryan could not or should not be placed with her in a reasonable amount of time, if at all.
 {¶ 16} We do not disagree with the trial court's findings as to the child's father. However, we find that the trial court's findings against Lannom, the child's mother, are not supported by clear and convincing evidence.
 {¶ 17} In its findings, the trial court relies heavily on Lannom's mental deficiencies. As a result of these deficiencies, the trial court finds that "[t]here is no likelihood that the mother will ever be able to provide for the needs of the child." The trial court concluded its finding as to the likelihood of placing the child with his mother by stating that it is "inappropriate to place the child with a mentally retarded parent who cannot care for herself." In making these findings, the trial court appears to implicate R.C. 2151.414(E)(2). To prove this factor, the record has to show the parent suffers from a chronic mental illness or mental retardation "so severe that it makes the parent unable to provide an adequate permanent home for the child." R.C. 2151.414(E)(2).
 {¶ 18} After reviewing the record, we cannot find clear and convincing evidence that Lannom's mental deficiencies are so severe that she will be unable to provide an adequate home for Bryan within the next year. The record shows that Lannom has an I.Q. of 61, which means she is considered to be mildly mentally retarded. (Tr. 8.) In his Psychological Parenting Evaluation, Dr. Kraus found that Lannom suffers from "severe cognitive defects," and that "her cognitive processes of attention, concentration, and ability to follow newly-learned instructions were extremely low." (Joint Exhibit A, p. 11). However, Dr. Kraus still recommended that Bryan be reunited with Lannom so long as certain treatment recommendations are satisfied.
 {¶ 19} Contrary to the trial court's finding, we cannot find any evidence that Lannom is incapable of caring for herself. The evidence shows that Lannom had lived on her own. (Tr. 75) It was only after Lannom's thirty day incarceration for child endangerment and her hospital stay for the injuries she suffered in a bicycle accident that she lost her home. Lannom obtains her own SSI check, does her own banking and pays her own bills. (Tr. 75). Further, the transcript contains no evidence demonstrating that Bryan was abused or neglected by Lannom. In fact Bryan's counselor, Susan Mitchell, testified that the only evidence that could be indicative of Bryan having been abused in any way was "only the fact that he was sometimes violent towards his brother." (Tr. 129). She later explained that this behavior could be indicative of things other than abuse. Id.
 {¶ 20} Mitchell did not recommend terminating Lannom's parental custody. When asked whether it would be appropriate to reunify Bryan with his mother, Mitchell did not respond, but stated that counseling between Bryan and his mother "would be very, very important." (Tr. 135). When pressed on how long this family counseling might take, she replied: "I would probably say it really depends on how often he is seen. I would think you could make progress on a weekly basis after say 10 or 12 sessions perhaps. On the other hand, . . . some thing about human nature aren't fixable, so its somewhat relative." (Tr. 139)
 {¶ 21} After reviewing all the evidence in this case, we cannot find that there is clear and convincing evidence to satisfy R.C.2151.414(E)(2).
 {¶ 22} R.C. 2151.414(E)(1) requires the trial court to find that the parent has failed continuously and repeatedly to remedy the conditions causing the child to be placed outside of the child's home. In making the determination as to whether the parent has substantially remedied those conditions, the trial court must consider the parent's utilization of the medical, psychiatric, psychological, and other social and rehabilitative resources available to her. R.C. 2151.414(E)(1).
 {¶ 23} R.C. 2151.414(E)(4) requires the trial court to find that the parent has demonstrated a lack of commitment toward the child by failing to visit or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.
 {¶ 24} The conditions which led to Lannom's son being taken away arose from an incident that occurred after Lannom's sister unexpectedly left her three young children with Lannom for a week. This forced Lannom to care for five children including Bryan and his brother. Lannom's three-year-old niece was found walking alone near railroad tracks, and Lannom was arrested, convicted and sentenced to thirty days in jail for child endangerment. As a result, Bryan and his brother were subsequently turned over to CCDJFS.
 {¶ 25} There is no doubt that the demands of having three additional children in her care at the time of the incident contributed to Lannom's failure to supervise her three-year-old niece. Lannom did not ordinarily watch her sister's children. When Lannom agreed to watch the children, she had no idea that she would have them with her for such a long period of time. Her sister dropped them off and did not return for them or call to inform Lannom of her whereabouts during the week prior to the incident.
 {¶ 26} Lannom has served her jail time on the child endangerment charge. There is nothing in the record to indicate that Lannom has any intentions of watching her sister's children again. Prior to the child endangerment charges, Lannom had no prior criminal record. Additionally, CCDJFS had no substantiated reports of problems regarding Lannom's supervision of her children. (Complaint for Emergency Shelter Care, June 4, 2001.) Therefore, it appears that Lannom has substantially remedied the specific conditions that led to having Bryan removed from her custody.
 {¶ 27} Lannom's original case plan called for her to complete five objectives: (1) complete a drug and alcohol assessment and follow through with any recommendations; (2)attend individual counseling; (3) complete a parenting and psychological evaluation and follow through with recommendations; (4) attend visitations with her children and use age appropriate parenting skills; and (5) attend family counseling with Bryan when it is deemed appropriate. (Tr. 46) Later the agency CCDJFS amended her case plan and added the objective that she move out of her mother's house and obtain her own appropriate housing. Id.
 {¶ 28} Lannom completed the first objective of her case plan by completing the drug and alcohol assessment. (Tr. 47). No recommendations were made to follow up on this objective. Id.. Likewise, Lannom completed her second objective by attending individual counseling. Although Lannom missed many sessions due to a broken leg, her counselor testified that after she returned from the injury, Lannom's attendance was pretty good. (Tr. 16). Her counselor further testified that Lannom was always a willing participant who listened and cooperated in her counseling sessions. (Tr.17).
 {¶ 29} Lannom also complied with her third case plan objective by completing her parenting and psychological evaluation with Dr. Kraus, a psychologist. As we stated earlier, Dr. Kraus recommended that Lannom be reunited with Bryan as long as she met several treatment recommendations. In particular, Dr. Kraus found it essential that Lannom comply with four recommendations.
 {¶ 30} "(1) Ms. Lannom shall continue her ongoing outpatient counseling/coaching with Mary Venrick at family Service Agency regarding parenting issues with a regularity and consistency deemed appropriate by Ms. Venrick but initially not less frequent than weekly sessions.
 {¶ 31} "(2) Ms. Lannom shall also reinstate her participation in parenting classes and report her progress to Ms. Venrick.
 {¶ 32} "(3) Concurrently, Ms. Lannom shall attend an ongoing individual psychotherapy, depression support group, or family counseling to address issues of family stress and accompanying dysthymia. The minimum length of treatment believed necessary to sufficiently address Ms. Lannom's psychological problems is expected to be one year. At that time, an evaluation is recommended to assess the appropriateness of further mental health treatment.
 {¶ 33} "(4) Ms. Lannom shall show prompt attendance at all scheduled visitations with her children as arraigned by CCCS." (Joint Exhibit A, p. 12).
 {¶ 34} In compliance with Dr. Kraus's four essential recommendations, Lannom attended counseling with Venrick. While she may not have attended the number of sessions that Dr. Kraus would have liked, as we explained earlier, many of her missed sessions were due to her recovery from a broken leg. After returning from the injury, her attendance was "pretty good." (Tr. 16). Lannom completed the recommended parenting classes by attending two different sets of classes. (Tr. 48). Angela Betty, Bryan's case worker, testified that she believed Dr. Kraus's third recommendation for counseling was part of the counseling with Venrick. (Tr. 48). Finally, as we explain in the subsequent paragraph, Lannom seemed to substantially comply with the visitation recommendation.
 {¶ 35} Lannom appears to have complied with the fourth case plan objective of attending visitations with her children and using age appropriate parenting skills. All of Lannom's visits with Bryan were held at the Clark County Children's Home. According to CCDJFS, Lannom missed only 17 of 57 possible visits with her children, and some of those visits were missed due to her thirty-day incarceration and the time she was in the hospital following her bicycle accident (Tr. 21, 33, 47). Evidence as to Lannom's interactions with her children during visits is inconsistent. Visitation supervisor, Gloria Woods, testified that there was a lack of interaction between Lannom and Bryan and that Bryan occasionally engaged in dangerous roughhousing with his brother during the visits. (Tr. 22, 26). However, in her testimony, Woods indicated that there is considerable animosity between Lannom and herself that Woods herself deems to be inappropriate. (Tr. 24). In Dr. Kraus' observation of a visit between Lannom and her children, he noted:
 {¶ 36} "Although the impressions are derived from very limited observation of the children, both children seem to have developed appropriate initiative, curiosity, and exploration of their surroundings and appropriate modeling and imitative behavior. Self-control, however, appears to be a challenging aspect of each child's personality, especially in Bryan's case. Both children seemed to respond to their mother's reinforcement and redirection but it is not clear that away from the authority-laden surroundings of supervised visitation whether the children would be as compliant. * * * Although the sample of behavior was limited, Ms. Lannom's style of parenting appeared to be authoritative in that her responses to the children appeared to be love-inducing through praise and reasoning. Although I believe she has more to learn, it was evident that Ms. Lannom had developed some skills in her previous parenting classes." (Joint Exhibit A, p. 9-10).
 {¶ 37} Lannom's fifth case plan objective was to attend family counseling with Bryan when it was deemed appropriate. Lannom made efforts to schedule family counseling with her son's counselor. Lannom called and set up an appointment, but failed to attend. It appears from the record that CCDJFS did not make diligent efforts to help Lannom complete this case plan objective. (Tr. 55, 132-133). It was Lannom who made the first inquiry to attend family counseling with Bryan's counselor, and the counselor's testimony reflects an impression that she was unaware that this family counseling was a requirement of Lannom's case plan. (Tr. 132-33).
 {¶ 38} CCDFJS amended Lannom's case plan and added a sixth requirement to her case plan that she move out of her mother's house and obtain her own appropriate housing. (Tr. 46, 74). Since her incarceration and bicycle accident, Lannom has lived with her mother and step father. CCDFJS stated that Lannom's living in her mother's house is inappropriate because when Bryan was originally taken away from her Lannom's mother and step-father were evaluated and it was determined that there was not an opportunity to place Bryan with them due to issues between Lannom's mother and CCDJFS that had occurred ten to fifteen years before. (Tr. 69-70).
 {¶ 39} Both Lannom's mother and step-father testified that they would welcome Bryan into their home. (Tr. 81, 88). While Lannom's mental ability may limit her ability to help Bryan with things like school work, Lannom's step-father testified that he would "enjoy" helping Lannom with discipline and school work. (Tr. 88.) Lannom's step-father further testified that he believed that with his help and with his wife's help, Lannom could do a good job of raising Bryan. (Tr. 89) While Lannom's step-father is disabled, he explained that a recent surgery significantly improved his condition. Because he doesn't work, he would generally be available to help.
 {¶ 40} Lannom's counselor testified that it will be difficult for Lannom to raise Bryan on her own, but she could probably raise him with "a lot of supervision and help." (Tr. 13) She further testified that, on her own, Lannom cannot handle the needs of the child. (Tr. 14). However, this statement, coupled with the case plan objective that Lannom move out on her own, seems to put Lannom in a catch twenty-two: she can't raise her children on her own, yet she can't avail herself of the help her parents can provide. CCDJFS has never been in Lannom's mother's home. (Tr. 73). Further, Lannom's mother testified that she was never told of any changes she needed to make to bring Bryan into her home. (Tr. 82).
 {¶ 41} After reviewing all the evidence in this case, we cannot find that there is clear and convincing evidence to satisfy R.C.2151.414(E)(1) or (4).
 {¶ 42} "Permanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case'." In re Hayes (1997), 79 Ohio St.3d 46, 48 (quoting In reSmith (1991), 77 Ohio App.3d 1, 16). Therefore, parents "must be afforded every procedural and substantive protection the law allows." Id. Lannom has worked to comply with her case plan. She is currently living with her mother and her step-father who have both expressed the desire to help Lannom in the raising of her son. For CCDJFS to terminate Lannom's parental rights without even visiting Lannom's mother's home to evaluate its potential is arbitrary and unreasonable. It appears to be based on some long-ago incident that offends CCDJFS because it was involved.
 {¶ 43} Prior to her child endangerment conviction, Lannom had no criminal record. Nor were there any substantiated reports of problems with her supervision of Bryan. The only reason CCDFJS became involved with her was the incident involving Lannom's niece. While the incident was very serious, it is unlikely to arise again, especially now that Lannom is living with her mother and her step-father.
 {¶ 44} For the abovementioned reasons, we find that the trial court abused its discretion in awarding permanent custody of Bryan to CCDJFS. Accordingly, Lannom's first assignment of error is sustained.
 SECOND ASSIGNMENT OF ERROR {¶ 45} "THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT FOUND THAT THERE WAS CLEAR AND CONVINCING EVIDENCE THAT THE CHILD'S BEST INTERESTS WOULD BE SERVED BY A PERMANENT CUSTODY AWARD TO THE AGENCY."
 {¶ 46} The second of the two predicate findings that the trial court was required to make is that granting permanent custody of the child to CCDFJS is in the best interests of the child. R.C. 2151.353. Because we sustained the first assignment of error and found that the first predicate finding was not supported by clear and convincing evidence, this assignment of error is moot and we are not required to address it. App.R. 12(A)(1)(C).
 {¶ 47} Having sustained Lannom's first assignment of error, we will reverse the judgment from which the appeal was taken and remand for further proceedings.
FAIN, P.J. and YOUNG, J., concur.